UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

YAE HTAT AUNG,

        Petitioner,

    v.

WILLIAM P. BARR, *in his official capacity as Attorney General, U.S. Department of Justice*;

CHAD WOLF, *in his official capacity as Acting Secretary, U.S. Department of Homeland Security*

THOMAS FEELEY, *in his official capacity as Field Director, Buffalo Field Office, U.S. Immigration and Customs Enforcement*; and

JEFFREY SEARLS, *in his official capacity as Acting Assistant Field Office Director and Administrator, Buffalo Federal Detention Facility*,

        Respondents.[1]

20-CV-681-LJV
DECISION & ORDER

The United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), has detained the *pro se* petitioner, Yae Htat Aung, for

---

[1] In its memorandum of law, the government argues that the only proper respondent in this matter is Jeffrey Searls, "the person with direct control over [Aung]." Docket Item 5 at 8. "Because resolution of who is the proper respondent will not affect the disposition of this petition, the Court will not address it further." *Khemlal v. Shanahan*, 2014 WL 5020596, at *2 n.3 (S.D.N.Y. Oct. 8, 2014). It is clear that, at the very least, Searls "has the *immediate custody* of the party detained, with the power to produce the body of such party before the court or judge, [so] that he may be liberated if no sufficient reason is shown to the contrary." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (emphasis in original) (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885)).

nearly twenty months while it has attempted to remove him to the Republic of the Union of Myanmar. Aung claims that his continued detention violates the Due Process Clause of the Fifth Amendment to the United States Constitution and 8 U.S.C. § 1231(a)(6), as interpreted by the Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001), and he seeks his immediate release. Docket Item 1 at 9.

For the reasons that follow, this Court agrees that there is "good reason to believe that there is no significant likelihood of [Aung's] removal in the reasonably foreseeable future," and therefore orders the respondents to "respond with evidence sufficient to rebut that showing." *See Zadvydas*, 533 U.S. at 701.

## **BACKGROUND**

The following facts, taken from the record, come largely from filings with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE").

Aung is a native and citizen of the Republic of the Union of Myanmar. Docket Item 1 at 1; Docket Item 4 at 2. He was admitted to the United States as a refugee on December 2, 2009, and became a Lawful Permanent Resident, retroactive to his date of admission, on September 12, 2014. Docket Item 1 at 6; Docket Item 4 at 2.

In July 2015, Aung was convicted in Buffalo City Court of assault in the third degree. *See* Docket Item 4-2 at 29, 36. In connection with that conviction, Hon. Amy C. Martoche issued a five-year order of protection, restraining Aung from coming within 100 feet of the protected individual. *Id.* at 17. In August 2016, Aung was convicted in Supreme Court, Erie County, of aggravated criminal contempt for having violated the

July 2015 protective order and causing physical injury to the protected individual. Docket Item 4-2 at 18.

On December 13, 2018, DHS arrested Aung.  That same day, DHS served Aung with a notice to appear, charging that he was subject to removal from the United States under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-1537.  Docket Item 4-2 at 2-6.  More specifically, DHS charged that Aung was subject to removal under section 1227(a)(2)(E)(ii) for having violated an order of protection issued because of credible threats of violence, repeated harassment, or bodily injury to the person for whom the order was issued.  *Id.* at 6.  DHS also determined that Aung was subject to mandatory detention under section 1226(c).  *Id.* at 8, 14.

After five adjournments—three to give Aung time to secure counsel—Aung appeared before an Immigration Judge ("IJ") on May 8, 2019, for a bond hearing.  *See* Docket Item 4-3 at 14-23; Docket Item 4-4 (Declaration of Elizabeth Burgus, Paralegal Specialist, Office of the General Counsel, Executive Office for Immigration Review). The IJ denied Aung's request for release on bond, explaining that Aung was a "[d]anger to the community in light of [his] recent criminal activity [and] [the] seriousness of [his] convictions."  Docket Item 4-3 at 23.

On May 28, 2019, an IJ denied Aung's motions seeking to terminate his removal. Docket Item 4-3 at 27.  Aung did not appeal the denial to the Board of Immigration Appeals ("BIA"), and the time to do so expired on June 27, 2019.  Docket Item 4-1 at 6 (Declaration of Jason Hanson, ICE Deportation Officer).  In the time since Aung's removal order became final, DHS has conducted four custody status reviews and found that his detention continues to be justified by Aung's danger to the community and risk

3

of flight.  *See* Docket Item 4-3 at 33-34 (October 2019) and 36 (January 2020); Docket Item 4-1 (Hanson Decl.) at 7 (April and June 2020).

On July 1, 2019, DHS requested travel documents from the embassy of the Republic of the Union of Myanmar.  Docket Item 4-3 at 29-30.  The Republic issued the documents on January 7, 2020.  *Id.* at 31-32.  According to Officer Hanson, DHS arranged to remove Aung on March 9, 2020, but was unable to do so due to the ongoing COVID-19 pandemic.  Docket Item 4-1 at 6.

Aung's travel documents expired on July 6, 2020, Docket Item 4-3 at 32, but Officer Hanson represents that DHS "will request a new travel document and will re-schedule [Aung's] removal once travel restrictions are lifted," Docket Item 4-1 at 7.

On June 5, 2020, Aung filed a petition for a writ of habeas corpus in this Court, seeking his immediate release.  Docket Item 1.  On July 28, 2020, the government answered, Docket Item 4; and on 6, 2020, Aung replied, Docket Item 6.

## DISCUSSION

28 U.S.C. § 2241 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)).  Aung argues that his continued detention violates 8 U.S.C. § 1231(a)(6), as interpreted by the Supreme Court in *Zadvydas*, 533 U.S. at 699, and his substantive rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.  Docket Item 1 at 7.

4

**I.     DUE PROCESS AND *ZADVYDAS***

The Due Process Clause prohibits the federal government from depriving any "person . . . of . . . liberty without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. The protection applies to "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693.

"[G]overnment detention violates the Due Process Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, or, in certain special and narrow nonpunitive circumstances, where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* (citations omitted) (alteration in original); *see also United States v. Haymond*, 139 S. Ct. 2369, 2373 (2019) (explaining that, other than those unique, special, and narrow circumstances, "[o]nly a jury, acting on proof beyond a reasonable doubt, may take a person's liberty"—a "promise [that] stands as one of the Constitution's most vital protections against arbitrary government"); *United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").

Under 8 U.S.C. § 1231(a), "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days" and "shall detain the alien" during that "removal period." *Id.* § 1231(a)(1)-(2). The removal period "shall be extended" and the Attorney General "may" continue to detain the noncitizen if he "fails or refuses to make timely application in good faith for travel or

other documents necessary to [his] departure or conspires or acts to prevent [his] removal subject to an order of removal." *Id.* § 1231(a)(1)(C).  After the removal period has lapsed, the Attorney General "may" continue to detain the noncitizen or release him under supervision.  *Id.* § 1231(a)(3), (6).

In *Zadvydas*, the Supreme Court, using the doctrine of constitutional avoidance, held that section 1231(a)(6) includes an implicit limit on "[a noncitizen's] post-removal-period detention to a period reasonably necessary to bring about that [individual's] removal from the United States."  533 U.S. at 689.  Detention under section 1231(a)(6) is "presumptively reasonable" for a period of six months.  *Id.* at 701.  After this period, if the noncitizen "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the burden shifts to the government to produce "evidence sufficient to rebut that showing."  *Id.*  "[A]s the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely [must] shrink."  *Id.*

"[G]ood reason to believe" does not place a "burden upon the detainee . . . to demonstrate *no* reasonably foreseeable, significant likelihood of removal or show that his detention is *indefinite*"; it instead requires only "good reason" to believe otherwise. *D'Alessandro*, 628 F. Supp. 2d at 404 (emphases added) (citations omitted).  This Court accordingly has determined that "the passage of time combined with" the "government [being] no closer to . . . repatriating [a noncitizen] than they were once they first took him into custody" are sufficient to meet that "initial burden."  *Singh v. Whitaker*, 362 F. Supp. 3d. 93, 102-03 (W.D.N.Y. 2019).

6

## II.   AUNG'S REMOVAL IS NOT REASONABLY FORESEEABLE

Aung's removal order became final on June 27, 2019.  Because none of that time is excluded under section 1231(a)(1)(C), Aung has been subjected to more than thirteen months of post-removal-order detention—more than twice the presumptively reasonable period.  "[W]hat counts as the 'reasonably foreseeable future'" therefore is quite narrow.  *See Zadvydas*, 533 U.S. at 701; *see also Shefqet v. Ashcroft*, 2003 WL 1964290, at *4 (N.D. Ill. Apr. 28, 2003) ("The period of [the p]etitioner's post-final-order detention has at this time exceeded seventeen months and so the 'reasonably foreseeable future' must now come very quickly.").

Aung has "provide[d] good reason to believe that there is no significant likelihood of [his] removal in the reasonably foreseeable future," *see Zadvydas*, 533 U.S. at 701.  The respondents have not provided the Court with a date by which they expect to remove Aung—in fact, they admit that removal is not possible at the moment both because they lack travel documents and because international travel has been largely suspended in the midst of the COVID-19 pandemic.  *Cf. Ramirez v. Searls*, No. 20-CV-6018 (CJS), 2020 WL 2748203, at *2 (W.D.N.Y. May 27, 2020) (emphasis added) (denying *Zadvydas* claim, notwithstanding delay caused by COVID-19, because DHS was "*in possession of a travel document*" and had "indicate[d] . . . that it [was] planning to remove [the petitioner] [within the next month]").

The question therefore is whether the government's prior success in obtaining travel documents and in arranging for Aung's removal constitutes "evidence sufficient to rebut [Aung's] showing," *Zadvydas*, 533 U.S. at 701.  On the current record, it does not.  First, DHS's prior effort to secure travel documents took six months, and DHS has not submitted evidence suggesting that the turnaround will be any faster this time around.

7

Second, the COVID-19 pandemic continues to rage, and there does not appear to be any loosening of travel restrictions on the horizon. Although DHS certainly is not the cause of COVID-19-related delays, neither is Aung, and the pandemic has not suspended his constitutionally-protected liberty interests. *See, e.g.*, *Hernandez v. Decker*, No. 20-CV-1589 (JPO), 2020 WL 1547459, at *2 (S.D.N.Y. Mar. 31, 2020) (concluding that the civil-immigration-detainee petitioner was likely to succeed on the merits of his deliberate-indifference claim under the Fifth Amendment because the respondents had "not taken any action to address the particular risks that COVID-19 pose[d] to [detained] high-risk individuals like [the p]etitioner").

In sum, on the current record, "this Court is left to guess whether [Aung's] deportation might occur in ten days, ten months, or ten years." *Singh*, 362 F. Supp. 3d at 102. Nevertheless, because of the uncertainty surrounding the pandemic, including the ever-changing state of international travel, the Court will give the respondents an opportunity to rebut Aung's showing. The government therefore must provide evidence specific to Aung's case showing that his deportation in likely to occur in ten days or ten months, not ten years. Such evidence might include correspondence from officials at the embassy of the Republic of the Union of Myanmar indicating that they are moving swiftly to provide Aung with new travel documents. It also might include "a date by which DHS reasonably expects [Aung] to be repatriated to [Republic of the Union of Myanmar]," but only if the government also "includ[es] the reasons behind and evidence supporting that expectation." *Singh*, 362 F. Supp. 3d at 105. The government has sixty days to provide such evidence.

8

### III.     AUNG'S REQUEST THAT DHS NOT TRANSFER HIM

Aung asks that the Court "order the [r]espondents not to transfer [him] outside the Western District of New York during the pendency of this petition."  Docket Item 1 at 10.  "It is well established that jurisdiction attaches on the initial filing for habeas corpus relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change."  *Santillanes v. U.S. Parole Comm'n*, 754 F.2d 887, 888 (10th Cir. 1985).  In other words, regardless of where DHS may house Aung in the future, this Court retains jurisdiction over his habeas petition.  So there is no need to interfere with DHS's authority to "arrange for appropriate places of detention" under 8 U.S.C. § 1231(g)(1).

### **CONCLUSION**

For the reasons stated above, the Court concludes that there is "good reason to believe that there is no significant likelihood of [Aung's] removal in the reasonably foreseeable future."  *See Zadvydas*, 533 U.S. at 701.  Therefore, "the [g]overnment must respond with evidence sufficient to rebut that showing," *see id.*, **within sixty calendar days of the date of this decision and order**.

SO ORDERED.

Dated:     August 10, 2020
               Buffalo, New York

                                                                  */s/ Hon. Lawrence J. Vilardo*
                                                                  LAWRENCE J. VILARDO
                                                                  UNITED STATES DISTRICT JUDGE